UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BENNIE CLOUD,

    *Plaintiff*,

v.

UNITED STATES OF AMERICA,

    *Defendant*.

Civil Action No. 17-316 (TJK)

## MEMORANDUM OPINION

Plaintiff Bennie Cloud, a corporal in the United States Marine Corps, suffered serious injuries, including a fracture of his femur, in a motor vehicle accident in March 2011. A few years later, he submitted a claim for benefits under the Servicemembers' Group Life Insurance Traumatic Injury Protection program, which required him to show that he was unable to perform two or more activities of daily life (ADLs) for thirty or more days. Cloud's initial claim for benefits and several of his intermediate appeals were denied. Then the Board for Correction of Naval Records (BCNR) denied his final appeal, finding that the evidence did not support his claim that he had been unable to perform two or more ADLs for the necessary time.

Cloud challenged the denial of his application for benefits on the ground that it was arbitrary and capricious under the Administrative Procedure Act (APA). The parties have cross-moved for summary judgment. *See* ECF Nos. 11, 14. For the reasons explained below, Defendant's motion will be granted and Cloud's will be denied.[1]

---

[1] In reaching its conclusion, the Court considered all relevant filings including, but not limited to, the following: Plaintiff's Complaint, ECF No. 1 ("Compl."); Defendant's Motion for Summary Judgment, ECF No. 11; Defendant's Memorandum in Support of its Motion for Summary Judgment, ECF No. 11-1 ("Def.'s MSJ Br."); Defendant's Statement of Material Facts, ECF No. 11-2 ("Def.'s SoMF"); Joint Appendix, ECF Nos. 11-4, 11-5, 11-6, 11-7 (with citations

## I. Background

### A. The TSGLI Program and Claims Process

Congress established the Servicemembers' Group Life Insurance Traumatic Injury Protection ("TSGLI") program in 2005 to provide financial help to servicemembers who have suffered "qualifying losses" from traumatic injuries. 38 U.S.C. § 1980A. A "qualifying loss" includes the "inability to independently perform" two or more ADLs for a minimum period of 30 consecutive days. 38 C.F.R. § 9.20(f)(20). The six ADLs the statute recognizes are bathing, continence, dressing, eating, toileting, and transferring in or out of a bed or chair with or without equipment. 38 U.S.C. § 1980A(b)(2)(D); *see* 38 C.F.R. § 9.20(e)(6)(vi). Under guidance issued by the Department of Veterans Affairs, a servicemember "is considered to have a [qualifying] loss of ADL if the member REQUIRES assistance to perform at least two of the six activities of daily living." Traumatic Injury Protection Under Servicemembers' Group Life Insurance (TSGLI): A Procedural Guide ("Procedures Guide") at 18 (available at http://www.benefits.va.gov/insurance/docs/tsgliproceduresguide.pdf). "If the patient is able to perform the activity by using accommodating equipment . . . or adaptive behavior, the patient is considered able to independently perform the activity." *Id.* Servicemembers are entitled to $25,000 for each consecutive 30-day period of ADL loss, up to a maximum of $100,000 for 120 consecutive days. 38 C.F.R. § 9.20(f)(20).

Marine Corps servicemembers first submit TSGLI claims to their branch of service. Procedures Guide at 50. The initial claim submission has two parts: "Part A, to be filled out by

---

designated as "AR __"); Plaintiff's Cross-Motion for Summary Judgment, ECF No. 14; Plaintiff's Memorandum in Support of his Cross-Motion for Summary Judgment, ECF No. 14-1 ("Pl.'s MSJ Br."); Plaintiff's Statement of Material Facts, ECF No. 14-2; Defendant's Opposition to Plaintiff's Cross-Motion and Reply in Support of its Motion for Summary Judgment, ECF No. 16; Plaintiff's Reply in Support of his Cross-Motion for Summary Judgment, ECF No. 18.

the claimant, and Part B, the 'Medical Professional's Statement,' in which the claimant's physician must certify the qualifying losses claimed." *Austin v. United States*, 614 F. App'x 198, 200 (5th Cir. 2015); *see* 38 C.F.R. § 9.20(g), (h). Upon receiving the claim, a certifying official at the Marine Corps will review the submission to determine whether the claimant "sustained a qualifying loss." 38 C.F.R. § 9.20(g); *see* Procedures Guide at 50. "If that official approves any benefits, . . . the private insurance company that administers the TSGLI program[] [will] pay such benefits." *Austin*, 614 F. App'x at 200. If the claim is denied, a servicemember may submit an appeal for first-level review to the Wounded Warrior Regiment's TSGLI Office (WWR-TSGLI) "within one year of the date of a denial of eligibility." 38 C.F.R. § 9.20(i); *see* Def.'s SoMF ¶ 19. Following that determination, servicemembers may submit a further appeal for second-level review to the TSGLI Appeals Board for the Navy Council of Review (ABNCR). Procedures Guide at 74. Finally, if the ABNCR denies their claim, servicemembers may appeal for third-level review to the BCNR. *Id.* At each stage of the appeals process, a denied servicemember receives a letter informing him of his right to file suit in federal district court to contest an adverse decision. *Id.* at 73–74.

### B. Cloud's Injury and Medical Treatment

Cloud drove his motor vehicle into a concrete wall near Harahan, Louisiana, in the early morning hours of March 18, 2011. AR 120–24. Police officers discovered him unconscious behind the steering wheel, with large lacerations on his head and injuries to his right leg and hip. AR 121–22. He was suffering from acute alcohol intoxication and had sustained an acute fracture of his right femur, a 5-centimeter scalp laceration, and a concussion. AR 138–39. His broken leg required surgery. AR 134–36. He was discharged from the hospital a few days later, with a schedule for receiving physical therapy. AR 131.

On March 29, Cloud met with a doctor as part of an initial consultation for his physical therapy treatment. AR 271. The doctor's notes from that appointment indicate that Cloud had "stopped taking pain pills 2 days [before]" and had "no numbness or tingling." *Id.* Also according to the notes, Cloud was "still using crutches to get around, although he was told he could weightbear on [his right leg] fully." *Id.* However, the notes also state that Cloud had "limited ability to flex his hip [due to] pain," "mildly limited range of motion of the knee [due to] pain," and that he "[was] not able to fully weightbear on his leg because of pain as well." *Id.* The notes further reflect that Cloud "[was] going to start with therapy to include gait training, weightbearing as tolerated, and range of motion." *Id.*

On April 5, about a week later, Cloud attended a physical therapy appointment. AR 264–65. In his notes, the physical therapist described Cloud as suffering from, among other things, "decreased ROM [range of motion], decreased joint mobility, decreased soft tissue mobility, decreased ADL function, decreased balance/proprioception, decreased strength, decreased weight bearing tolerances, impaired gait, [and] joint pain." AR 264. He described Cloud's rehabilitation goals as "walk[ing] again, get[ing] back to activities he previously did, [and] get[ing] in and out of vehicles." *Id.* The notes also indicated that Cloud "ha[d] not had a lot of pain" and "ha[d] been walking on [his right leg] a little bit." *Id.* Two days later, Cloud had another physical therapy appointment. AR 266–67. The notes of that session describe a similar assessment of his injury and progress recovering. *Id.*

Another week passed. And on April 12, Cloud attended another follow-up appointment with his doctor. AR 269. The doctor's notes reflect that, at that point, Cloud "ha[d] no pain" although he had "ha[d] not taken any pain pills." *Id.* The notes confirm that Cloud could flex his right leg "almost 90 degrees" and could "actually extend[] to -30 degrees." *Id.* As part of

Cloud's treatment plan, the notes state that he was "allowed to start weightbearing in the next 10 days" and was to "continue with therapy." *Id.*

On April 29 and May 6, Cloud attended additional physical therapy appointments. AR 274–79. The physical therapist's notes from those sessions are largely duplicative of those from earlier ones. *Id.* On April 29, the therapist noted that Cloud reported "stiffness in his knee when bending it." AR 274. On May 6, he recorded that Cloud had been "tired after [the] last session but not necessarily sore." AR 277.

On May 3, Cloud attended another follow-up appointment with his doctor. AR 280. The doctor's notes from that appointment reflect that Cloud's physical therapy "ha[d] been going very well" and that he "[was] able to bear some weight on [his right leg] with no pain." *Id.* The doctor indicated that Cloud was "ambulating without any assistance," "ha[d] full range of motion within his knee joint," and was "not taking any pain medication for his right femur at this point." *Id.*

### C. Procedural History

Cloud filed a claim for TSGLI benefits in March 2014. AR 345–57. He alleged that his injuries caused him to be unable to perform the ADLs of bathing, dressing, toileting, and transferring from March 19, 2011, to April 22, 2011. *Id.* In Part B of his claim, a nurse reviewer certified that Cloud required daily assistance with four ADLs during that period. AR 356. Without his family's help, she stated, Cloud "could not have performed these ADLs." *Id.* In further support of Cloud's claim, the nurse reviewer submitted a summary of his treatment records that she concluded "demonstrate[d] [Cloud's] inability to perform [ADLs] for over 30 days." AR 331–35. Cloud also submitted signed declarations from himself, his mother, and his brother. AR 336–44. The statements from his mother and brother, his caregivers from March 19 to April 22, 2011, describe the physical challenges Cloud faced following his surgery and the

5

assistance they provided him with bathing, dressing, toileting, and transferring during that time. *See id.*

In July 2014, the Office of Servicemembers' Group Life Insurance (OSGLI) denied Cloud's application. AR 97–99. The OSGLI explained that his "claim for the inability to perform [ADLs] due to traumatic injury . . . was not approved because medical documentation provided [did] not indicate that [his] loss met the minimum standards for TSGLI." AR 98. The letter summarized that:

> To qualify, a claimant must have been unable to independently perform at least two activities of daily living (ADLs) for at least 30 consecutive days. The claimant is considered *unable* to perform an activity independently only if he or she *requires* at least one of the following, without which they would be *incapable* of performing the task
>
> - physical assistance (hands-on)
> - stand-by assistance (within arm's reach)
> - verbal assistance (must be instructed)
>
> Your inability to perform two or more ADLs for at least 30 days must also have been certified by a medical professional.

AR 97–98.

The next month, Cloud appealed to WWR-TSGLI. AR 48–50. He argued that, although the records did not explicitly address his ADL limitations, the declarations provided by Cloud, his mother, and his brother "establish the requirement of ADL assistance . . . and explain how [he] was dependent on their assistance." AR 50. And according to Cloud, "[t]here are no medical records that refute th[eir] statements." *Id.* Cloud also argued that the declarations "*must* be given proper consideration." AR 48–49 (citing *Fail v. United States*, No. 12-1761 (MSK), 2013 WL 5418169, at *10, *13 (D. Colo. Sept. 27, 2013)). About two weeks later, WWR-TSGLI denied his appeal. AR 45–47. The denial letter concluded that the "available medical documentation did not support that [Cloud] had . . . the scheduled loss of at least two [ADLs] for

30 days." AR 45. Further, it noted that Cloud's claim "was also reviewed by our Regimental Nurse who concurred that the medical documentation did not support a loss of at least two [ADLs] (bathe, dress, toilet, and transfer) for 30 days." *Id.*

In September 2014, Cloud appealed to the ABNCR. AR 32. Again, Cloud argued that if the medical records "do not conclusively prove or disprove the ADL assistance required . . . statements [from caregivers] *must* be given proper consideration." *Id.* In September 2015, ABNCR denied Cloud's appeal, stating that it "found insufficient evidence to support the member's claim for . . . 30 days loss of ADL (bathe, dress, toilet, and transfer)." AR 28–30. In the notes accompanying its denial, ABNCR cited the April 2011 physical therapy records as a basis for its conclusion. AR 31.

Later in September 2015, Cloud appealed to the BCNR. AR 16–18. He argued that the prior denials were "not consistent with the submitted statements and medical reports." AR 16. Further, he argued that "the TSGLI office has provided no specific reference as to why the claim was denied." *Id.* In June 2016, a three-member panel of the BCNR denied his appeal. AR 3–4. Upon consideration of Cloud's "application, together with all material submitted in support thereof, [his] naval record and applicable statutes, regulations and policies," the BCNR determined that it "was unable to find an error or injustice warranting a correction to [his] record." *Id.* After "carefully consider[ing]" his arguments, the BCNR informed Cloud that while it "d[id] not dispute that [his] mother and brother provided the care described in the statements contained in [his] application, [the BCNR] was also unable to find medical evidence that showed [he] required the care." AR 3. And further, the BCNR stated that the notes from Cloud's follow-up appointment with his doctor on April 12, 2011 indicate that he was not "suffering pain from [his] injury and [was] no longer taking pain medication." *Id.* In addition,

7

the Board noted, Cloud was "able to flex [his] leg almost 90 degrees during the session." *Id.* According to "[t]hese observations by the physical therapist," the BCNR confirmed that it was "convinced . . . that [he] was able to perform ADLs by [him]self despite still receiving assistance from [his] family." AR 3–4. And "[a]bsent additional medical evidence that showed otherwise," the BCNR stated that it "was not inclined to overrule the previous decisions to deny [his] request for TSGLI." AR 4.

In February 2017, Cloud filed the instant suit, seeking review of the denial of his TSGLI claim. Compl.

## II. Legal Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When "a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal" and "[t]he 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (quoting *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993)). In this context, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Lannett Co. v. U.S. Food and Drug Admin.*, 300 F. Supp. 3d 34, 41 (D.D.C. 2017) (quoting *Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007)).

Under the APA, a court must set aside an agency decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Courts "will not disturb the decision of an agency that has examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Ams. for Safe Access v. DEA,* 706 F.3d 438, 449 (D.C. Cir. 2013) (alterations

8

and internal quotations omitted).  Under this standard, an "agency's decision is presumed to be valid and a court must not 'substitute its judgment for that of the agency.'" *Havens v. Mabus*, 146 F. Supp. 3d 202, 214 (D.D.C. 2015) (internal citations omitted) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  "[T]he party challenging an agency's action as arbitrary and capricious bears the burden of proof." *City of Olmstead Falls v. FAA*, 292 F.3d 261, 271 (D.C. Cir.2002) (quoting *Lomak Petroleum, Inc. v. FERC*, 206 F.3d 1193, 1198 (D.C. Cir. 2000)).

The D.C. Circuit typically reviews decisions by military review boards for the correction of military records under "an unusually deferential application of the 'arbitrary and capricious' standard." *See Piersall v. Winter*, 435 F.3d 319, 324 (D.C. Cir. 2006) (citing *Kreis v. Sec'y of Air Force*, 866 F.2d 1508, 1514 (D.C. Cir. 1989)).  However, Defendant has not cited a case where the Circuit applied this standard to a military board's decision on a TSGLI benefits claim, *see* Def.'s MSJ Br. at 10–11, and some district courts in this Circuit have been reluctant to apply this level of deference in TSGLI cases, *see Moreno v. Spencer*, 310 F. Supp. 3d 83, 87 (D.D.C. 2018); *Hensley v. United States*, 292 F. Supp. 3d 399, 408 (D.D.C. 2018); *but see White v. United States*, No. 17-193 (RMC), 2018 WL 5251740, at *8 (D.D.C. October 22, 2018) (applying the "unusually deferential" standard to a TSGLI benefits decision without analysis). Because the Court ultimately concludes that the BCNR's denial was not arbitrary and capricious under the ordinary APA standard, it need not determine whether the "unusually deferential" standard applies here.

### III. Analysis

Cloud challenges the BCNR's denial of his benefits claim as arbitrary and capricious on three grounds.  He argues that (1) the BCNR did not apply the correct evidentiary standard in evaluating his application; (2) its denial was unsupported by substantial evidence; and (3) it

9

failed to adequately explain its decision. For the reasons explained below, the Court concludes that Cloud's arguments are without merit and that the Defendant is entitled to summary judgment.

A. **Whether the BCNR Applied the Correct Evidentiary Standard**

First, Cloud argues that the BCNR failed to apply the proper evidentiary standard in denying his benefits claim.[2] Navy regulations require the BCNR to apply a preponderance of the evidence standard in evaluating TSGLI claims. SECNAV Instruction 1770.4A § 3(e)(2). "Preponderance of the evidence is that evidence that tends to prove one side of a disputed fact by outweighing the evidence on the other side." *Id.*; *see also Almerfedi v. Obama*, 654 F.3d. 1, 5 (D.C. Cir. 2011) ("The preponderance standard instead asks the court simply to 'make a comparative judgment about the evidence' to determine whether a proposition is more likely true than not true based on the evidence in the record." (quoting *Lindsay v. Nat'l Transp. Safety Bd.*, 47 F.3d 1209, 1231 (D.C. Cir. 1995))). Under this standard, the preponderance of the evidence "does not necessarily mean a greater mass of evidence," but rather the "superiority of evidence on one side or the other of a disputed fact." SECNAV Instruction 1770.4A § 3(e)(2). Thus, preponderance "is a term that refers to the quality, rather than the quantity, of the evidence." *Id.*

The record does not show that the BCNR failed to apply the preponderance of the evidence standard. The BCNR represented to Cloud that it had reviewed his application "in accordance with administrative regulations and procedures applicable to [its] proceedings," which include that standard. AR 3. And there is nothing in the record that suggests otherwise.

---

[2] Cloud argues separately that the BCNR misapplied both the "standard of review" for TSGLI claims under 38 C.F.R. § 9.20(f) and the "preponderance of the evidence standard." Pl.'s MSJ Br. at 14–15, 18–21. However, § 9.20(f) only sets forth the benefits a servicemember will receive upon demonstrating that she suffered a qualifying loss; it does not provide a standard of review for the appeal of TSGLI claims. The Court understands Cloud to be asserting that the BCNR applied an incorrect evidentiary standard in weighing the evidence.

The BCNR's denial letter to Cloud, as described in more detail below, merely reflects that the BCNR weighed the evidence and found certain medical evidence—notes related to his physical therapy session on April 12—to be the most persuasive evidence on the question of whether he suffered a qualifying ADL loss for the entire 30-day period. *See* AR 3–4.

Cloud contends that the BCNR applied the incorrect evidentiary standard because it denied his claim due to the "'lack of additional medical evidence' beyond the certification of medical professionals provided in response to Part B of the TSGLI benefits application." Pl.'s MSJ Br. at 16. "By purporting to add a 'requirement' that contemporaneous treatment records ongoingly show specific ADL limitations," Cloud argues, the BCNR "knowingly erected a barrier to compensation that most claimants with valid ADL limitations will never meet." *Id.* at 18. In other words, Cloud alleges that the BCNR improperly required his contemporaneous medical records to affirmatively show that he suffered ADL losses. This new standard, he argues, "cannot be found in any statute, rule, or the record." *Id.* at 16.

But that is not what the record shows happened here. As reflected in Cloud's denial letter, the BCNR identified evidence in his medical records that suggested he *was* able to perform ADLs independently during the relevant 30-day period. *See* AR 3–4. It weighed that evidence against the other evidence in the record, which included the statements from Cloud, his certifying nurse reviewer, and his caregivers. *See id.* And in the absence of additional medical evidence, it concluded that he had not shown that he had suffered a qualifying ADL loss for the entire 30-day period he claimed. That the BCNR pointed out there was no "additional medical evidence" for it to weigh in Cloud's favor does not mean that it failed to apply the correct evidentiary standard.

11

### B. Whether Substantial Evidence Supports the BCNR's Decision

Next, Cloud argues that the BCNR's denial was "unsupported by substantial evidence." Compl. ¶ 24. "Substantial-evidence review is highly deferential to the agency fact-finder, requiring only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rossello ex rel. Rossello v. Astrue*, 529 F.3d 1181, 1185 (D.C. Cir. 2008) (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)); *see also Holmes v. United States*, No. 17-1674 (JDB), 2018 WL 131955, at *8 (D.D.C. January 8, 2019) (upholding the denial of a TSGLI benefits claim under the substantial-evidence test). "Because this standard is 'something less than the weight of the evidence, . . . the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" *Schoenbohm v. FCC*, 204 F.3d 243, 246 (D.C. Cir. 2000) (omission in original) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)).

To successfully bring a TSGLI benefits claim on the basis of ADL loss, Cloud must show that he was unable to independently perform at least two ADLs for a period of at least 30 consecutive days. 38 C.F.R. § 9.20(e)(6)(vi), (f)(20). And if the BCNR determined that Cloud "[wa]s able to perform the activity by using accommodating equipment . . . or adaptive behavior," then it must consider him to have been "able to independently perform the activity." Procedures Guide at 18. Thus, to qualify for benefits, Cloud was required to prove that he suffered qualifying ADL losses from the date of his injury on March 18, 2011 until April 17. *See* 38 C.F.R. § 9.20(f)(20). He claims to have experienced such losses for a few additional days, through April 22. AR 116–17.

The Court concludes that the BCNR's decision to deny Cloud's claim met the substantial-evidence test. Records from Cloud's appointment with his doctor on March 29 reflect that although he "was told he *could* weightbear on [his right leg] fully," at that time, he

did not "fully weightbear on his leg *because of pain*." AR 271 (emphases added). Then, on April 12, his doctor recorded that Cloud had "not taken any pain pills" and was in "no pain" after receiving "a few sessions of physical therapy." AR 269. And more, during that session, the physical therapist noted that Cloud could flex his right leg "almost 90 degrees." *Id.* Thus, while the evidence was far from overwhelming, "a reasonable mind might accept [it] as adequate" to support the determination that, based on a preponderance of the evidence, Cloud was "able to perform the ADLs by [him]self" at some point before April 17. *Astrue*, 529 F.3d at 1185; AR 3–4.

Cloud argues that the BCNR's conclusion was not supported by substantial evidence, but his arguments come up short. He contends that the BCNR disregarded evidence in his medical records showing that he was unable to perform at least two ADLs from March 18 through April 22. Pl.'s MSJ Br. at 19–20. In particular, he focuses on the statement in his doctor's notes from April 12 that he was "allowed to start weightbearing in the next 10 days," AR 269, which he asserts is tantamount to an "order[] not to bear weight on his leg," Pl.'s MSJ Br. at 19. And because "[t]here is no evidence in the medical records that states explicitly or implicitly that [he] could perform [ADLs] while he was not allowed to weight-bear," he contends that the BCNR's conclusion that he "could perform the ADLs without assistance is speculative" and "based on pure assumption." *Id.* at 19–20.

But it is Cloud's argument that relies on speculation and assumption. To begin with, the BCNR informed Cloud that—far from disregarding certain evidence—it had considered "all material submitted in support" of his application, including his medical records. AR 3. Moreover, the medical records do not show that Cloud was ordered not to bear weight on his right leg, as his argument presupposes. To the contrary, as early as March 29, Cloud's doctor

recorded that he "was told he could weightbear on [his right leg] fully." AR 271. And even assuming that note conflicts with the one on April 12 on the question of whether Cloud's right leg could fully bear his weight at any given point, "the existence of conflicting evidence is not enough" to find the BCNR's overall conclusion unsupported by substantial evidence. *Holmes*, 2019 WL 131955, at *9. As explained above, the BCNR's conclusion that Cloud could perform ADLs without assistance before April 17 was based on evidence in the record that "a reasonable mind might accept as adequate." *Astrue*, 529 F.3d at 1185. That is all the APA requires.

Cloud seizes on a few other notations in his medical records to bolster his argument, but none suggest that the BCNR's determination was arbitrary and capricious. He points to entries in his April 5 and April 7 physical therapy records reflecting that he suffered from decreased "ADL function, decreased balance/proprioception, decreased strength, decreased weight bearing tolerances, impaired gait, decreased workability, edema, joint pain, and soft tissue pain." Pl.'s MSJ Br. at 25 (quoting AR 266). But these comments only confirm what is not in dispute—that he continued to suffer some impairment as he recovered from his accident.

Cloud also cites an entry in his physical therapy records from April 29, which states that he was there "for right leg stiffness, lack of ROM, inability to weight bear, [and] pain." Pl.'s MSJ Br. at 25 (quoting AR 274). This entry, he argues, demonstrates that his "non-weight bearing status, and its resulting limitations, extended beyond the 30 day period of time at issue." *Id*. at 26. But Cloud's own nurse reviewer certified that he began to fully bear weight on April 22. *Id*. at 9 (citing AR 42). And upon close inspection, the April 29 entry appears to describe the reasons Cloud was referred for physical therapy in the first place, as opposed to his condition on that specific date. Each set of physical therapy notes from April 5 to May 6 contains an identical entry. *See* AR 264, 266, 274, 277.

Finally, Cloud argues that the BCNR improperly discounted the statements from his certifying nurse reviewer and caregivers when considering his claim. Because "there is no evidence contrary to the statements and medical opinions submitted," Cloud contends that the BCNR should have given greater weight to the nurse reviewer's conclusions and treated the caregivers' statements as "dispositive." Pl.'s MSJ Br. at 22–25 (citing *Fail*, 2013 WL 5418169, at *7, *13). But as explained above, the BCNR *did* identify contrary evidence in the contemporaneous medical records, which it weighed against the nurse reviewer and caregiver statements. *See* AR 3. In weighing all the evidence, the BCNR was entitled to give greater weight to contemporaneous medical records than after-the-fact statements submitted by the certifying nurse reviewer and Cloud's caregivers. *See Moreno*, 310 F. Supp. 3d at 89; *Austin*, 614 F. App'x at 205. And because it was within the BCNR's discretion to "find[] some pieces of evidence more persuasive than others," *White*, 2018 WL 5251740, at *10 (rejecting a similar argument relying on *Fail*), the Court may not second-guess its decision to do so.

### C. Whether the BCNR Provided a Reasoned Explanation

Cloud also argues at various points in his briefing that the BCNR failed to provide a reasoned explanation for its decision. *See, e.g.*, Pl.'s MSJ Br. at 22 ("The Board provided only an inadequate explanation as to why the preponderance of the supplied evidence did not support [Cloud's] claim, and why that evidence was deemed insufficient or less than credible."). Under the APA, the BCNR is required to provide a "brief statement of the grounds for denial." 5 U.S.C. § 555(e); *see Butte County v. Chaudhuri*, 887 F.3d 501, 505 (D.C. Cir. 2018). And courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *State Farm*, 463 U.S. at 43 (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)). However, the agency's explanation "must minimally contain 'a rational connection between the facts found and the choice made,'" *Dickson v. Sec'y of Def.*, 68

15

F.3d 1396, 1404 (D.C. Cir. 1995) (quoting *State Farm*, 463 U.S. at 43), and the "'failure to respond meaningfully' to objections raised by a party renders [a] decision arbitrary and capricious," *PSEG Energy Res. & Trade LLC v. FERC*, 665 F.3d 203, 208 (D.C. Cir. 2011) (quoting *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005)). Further, a court "may not supply a reasoned basis for an agency action that the agency itself did not give in the record under review." *Pierce v. SEC*, 786 F.3d 1027, 1034 (D.C. Cir. 2015).

The BCNR's explanation for its decision, while inelaborate, meets these requirements. The BCNR stated that it had "carefully considered" Cloud's arguments and "all material submitted in support thereof" but was "unable to find an error or injustice" that warranted a reversal of its decision. AR 3–4. In reaching that conclusion, the BCNR described evidence in the April 12 notes from his doctor's appointment that it found to contradict the conclusions "in the statements contained in [Cloud's] application." *Id.* Specifically, it explained that the doctor's statements that, by April 12, Cloud was "not . . . suffering pain from [his] injury" and "[was] able to flex [his] leg almost 90 degrees" "convinced [the BCNR] that [he was] able to perform the ADLs by [him]self despite still receiving assistance from [his] family." *Id.* In so doing, the BCNR sufficiently articulated a rational connection between its decision and the factual record before it.[3]

---

[3] Cloud also argues that the BCNR's denial was arbitrary and capricious because it failed to reference the "legal standard" that it applied to his case. *Id.* at 19. However, the OSGLI set forth the applicable legal standard in its original denial of Cloud's claim. *See* AR 97 ("To qualify, a claimant must have been unable to independently perform at least two activities of daily living (ADLs) for at least 30 consecutive days. The claimant is considered *unable* to perform an activity independently only if he or she *requires* at least one of the following, without which they would be *incapable* of performing the task: . . . physical assistance (hands-on) . . . stand-by assistance (within arm's reach) . . . verbal assistance (must be instructed)."). And the BCNR informed Cloud that it had reviewed his application "in accordance with administrative regulations and procedures applicable to [its] proceedings," which would include

Moreover, the BCNR responded meaningfully to evidence Cloud submitted in support of his claim and the main objection he raised below. The BCNR directly addressed the statements submitted by Cloud's caregivers when it explained that, while it "does not dispute that [Cloud's] mother and brother provided the care described in the statements . . . , the [BCNR] was also unable to find medical evidence that showed [he] required the care." AR 3. Thus, while the BCNR acknowledged that Cloud received assistance from his caregivers as described in their statements, it determined that he had not established that such assistance was actually required in light of countervailing evidence in the medical records. Although brief, this response sufficiently grapples with the factual assertions put forward in those statements.

For the foregoing reasons, the Court concludes that the BCNR met its burden to explain its reasons for denying Cloud's claim and meaningfully respond to evidence Cloud submitted to the contrary.

## IV. Conclusion and Order

For all of the above reasons, the Court will, in a separate Order, grant Defendants' Motion for Summary Judgment, ECF No. 11, and deny Cloud's Cross-Motion for Summary Judgment, ECF No. 14.

**SO ORDERED.**

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: April 30, 2019

---

the appropriate legal standard. AR 3. Cloud points to no authority indicating that the BCNR was required to restate that standard in denying his final appeal.